# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KAREN S. ZOMBECK,        )
                               )
             Plaintiff,      )
                               )
      vs.                 )     2:08cv1626
                               )     Electronic Filing
                               )
FRIENDSHIP RIDGE,        )
                               )
             Defendant.    )

## OPINION

Karen S. Zombeck, ("plaintiff") commenced this action seeking redress for an alleged violation of the Americans with Disabilities Act ("ADA"), claiming her employer, Friendship Ridge ("defendant"), failed to provide a reasonable accommodation that would allow her to perform the "essential functions" of a nurse aide. Presently before the court is defendant's motion for summary judgment. For the reasons set forth below, the motion will be denied.

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's claim, and upon which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. When the movant does not bear the burden of proof on the claim, the movant's initial burden may be met by demonstrating the lack of record evidence to support the

opponent's claim.  <u>National State Bank v. National Reserve Bank</u>, 979 F.2d 1579, 1582 (3d Cir. 1992).  Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a <u>genuine issue for trial</u>," or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  <u>Matsushita Electric Industrial Corp. v. Zenith Radio Corp.</u>, 475 U.S. 574 (1986) (<u>quoting</u> Fed.R.Civ.P. 56 (a), (e)) (emphasis in <u>Matsushita</u>).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986).

In meeting its burden of proof, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  <u>Matsushita</u>, 475 U.S. at 586.  The non-moving party "must present affirmative evidence in order to defeat a properly supported motion" and cannot "simply reassert factually unsupported allegations."  <u>Williams v. Borough of West Chester</u>, 891 F.2d 458, 460 (3d Cir. 1989).  Nor can the opponent "merely rely upon conclusory allegations in [its] pleadings or in memoranda and briefs."  <u>Harter v. GAF Corp.</u>, 967 F.2d 846 (3d Cir. 1992).  Likewise, mere conjecture or speculation by the party resisting summary judgment will not provide a basis upon which to deny the motion.  <u>Robertson v. Allied Signal, Inc.</u>, 914 F.2d 360, 382-83 n.12 (3d Cir. 1990).  If the non-moving party's evidence merely is colorable or lacks sufficient probative force summary judgment must be granted.  <u>Anderson</u>, 477 U.S. at 249-50; <u>see</u> <u>also</u> <u>Big Apple BMW, Inc. v. BMW of North America</u>, 974 F.2d 1358, 1362 (3d Cir. 1992), <u>cert.</u> <u>denied</u>, 113 S.Ct. 1262 (1993) (although the court is not permitted to weigh facts or competing inferences, it is no longer required to

"turn a blind eye" to the weight of the evidence).

The record as read in the light most favorable to plaintiff establishes the background set forth below. Plaintiff was employed by defendant as a nurse aide from April 18, 1988 to February 1, 2006. Defendant runs a 600 bed long-term care nursing home in Beaver County, Pennsylvania and employs approximately 600 people.[1] The facility is comprised of twelve units that are each staffed with nurse aides.

For approximately five years, plaintiff was able to perform satisfactorily all the functions listed in defendant's job description for the nurse aide position. The job description listed twenty functions which were deemed to be "essential." Ex. H, Friendship Ridge Nurse Aide Job Description (Doc. No. 23-8) at 3. Among the functions listed was: "[h]elps to transfer the residents to and from bed and wheelchair or recliner chair using the mechanical lift, if necessary." Id. The physical demands of the position were listed under a separate heading and required that a nurse aide "physically be able to meet medium to heavy demands of standing, walking, bending, lifting, reaching, and pushing." Id. Plaintiff was capable of performing the full range of her duties as nurse aide until she sustained two work-related injuries to her knee in 1992 and 1993, for which she received worker's compensation benefits.

Following her second injury in 1993, plaintiff's knee became too unstable to lift and transfer residents, and rendered her unable to work in a regular duty capacity. Her injuries qualified her for defendant's modified work program, a rehabilitative program which allowed employees recovering from work-related injuries to perform duties tailored to their specific

_____

[1] The Service Employees Union District 1199P represents the majority of employees in one of two separate bargaining units. Plaintiff was a member of the unit which consisted of about 400 non-professional hourly employees.

limitations as determined by a physician. She began working in a light/modified duty capacity which did not require her to lift.[2] On modified duty, plaintiff was responsible for: i) passing out ice water, ii) taking and documenting all resident temperatures, iii) stripping and making beds, iv) sorting and distributing clothes, v) completing intakes and outputs, vi) transferring residents in wheelchairs, vii) distributing and retrieving food trays, viii) feeding residents, ix) documenting one-on-one's, x) washing residents' face and hands and assisting them with their oral care, and xi) shaving residents. Ex. B, Plaintiff's Deposition (Doc. No. 23-2) at 11. Plaintiff continued to work in this modified duty position for thirteen years, until her termination in 2006.[3] With the exceptions of major bathing and lifting, she performed the same duties as an aide working regular duty and maintained the job title of "nurse aide" at all times during her eighteen year employment.

In December of 2005, plaintiff was verbally notified that due to financial concerns, the modified work program was being restructured and consequently would result in the elimination of her modified duty position. Prior to the restructuring, the program did not restrict the amount of time that an injured employee could remain in a modified duty position. As a cost-cutting measure, the policy was changed to limit the amount of time spent occupying such a position to a period of no longer than six months. After the six month period expires, "if the employee is unable to return to [his or her] former job or successfully bid on another

---

[2] The record reflects that "light duty" and "modified duty" are interchangeable terms used to describe a set of duties tailored to plaintiff's physical limitations as they relate to her nurse aide position.

[3] Defendant contends that plaintiff was released to "regular duty" following a finger injury in 2005, but in the light most favorable to plaintiff, her explanation that "regular duty" meant "whatever job [she] held prior to injuring [her] finger," which was modified duty, must be accepted. See Ex. B. at 52.

position for which they are qualified . . . the modified duty position will end and they shall return to worker's compensation status." Ex. J, Friendship Ridge Administrative Policies and Procedures (Doc. No. 23-10) at 3.

As part of the verbal notice plaintiff received, defendant told her she "either had to go back [to] regular duty or go back off on workmen's comp." Plaintiff's Deposition at 14. She received a letter dated January 2, 2006, which informed her that her modified nurse aide position was being eliminated and to contact human resources should her medical condition improve such that she would be able to perform the essential functions of the regular nurse aide position, with or without reasonable accommodation, and therefore could return to work. Ex. K, Notice of Elimination of Modified Duty Position (Doc. No. 23-11) at 2.

Plaintiff's termination date was extended to February 1, 2006 due to union contract issues and also to allow her to consult her doctor to determine whether she could return to nurse aide position in regular duty capacity. Plaintiff met with Dr. Michael R. Cozza ("Dr. Cozza") and showed him the nurse aide job description. She conveyed that she would be able to lift and transfer residents if she could use a mechanical lifting device for situations where the resident could not hold their own weight and assist in transferring themselves. Dr. Cozza released plaintiff for regular duty work on a "trial basis" with the following restrictions: i) no squatting, ii) no mandatory overtime, and iii) no lifting or transferring without the use of a mechanical lift. Ex. P, Dr. Cozza's Medical Release (Doc. No. 23-16) at 2.

Plaintiff presented the release to Joyce Pruszenski, the administrator for the worker's compensation program, and requested that she be able to work pursuant to the accommodations suggested by Dr. Cozza. Ms. Pruszenski did not discuss whether plaintiff's requested

accommodations were feasible or whether any other accommodations existed that would have allowed her to remain employed. Instead, she responded by telling plaintiff that "they couldn't take [her] back and make accommodations for [her] because [she] was not covered by the American Disability Act." Plaintiff's Deposition at 19. Plaintiff told her that she was in fact covered, and that defendant has been fully aware of her limitations "from day one." Id. Unable to convince defendant that she was covered by the Act, she received her official termination letter dated February 3, 2006, telling her not to report to work until further written notice. Ex. Q, Notice of Termination (Doc. No. 23-17) at 2.

Over the next couple of years plaintiff's medical conditions worsened. On May 19, 2008, she filed for social security disability benefits, claiming an onset date of August 15, 2006. Ex. U, Disability Report (Doc. No. 23-21) at 3. The Social Security Administration deemed plaintiff disabled as of August 15, 2006, more than seven months after her termination date. Ex. AA, Notice of Award (Doc. No. 23-27) at 2. Plaintiff receives $1, 003.00 per month in social security disability benefits. Id. at 3.

The Equal Employment Opportunity Commission issued a letter of determination in favor of plaintiff on June 20, 2008. EEOC Determination (Doc. No. 25-2) at 2. It determined that plaintiff articulated a reasonable accommodation in stating that she needed the assistance of a mechanical lift. It found reasonable cause to believe that defendant violated the ADA when it removed the effective accommodation of allowing her to remain in a modified duty position after thirteen years and failed to provide an alternative accommodation. It also concluded that defendant failed to engage in the interactive process of discussing effective accommodations that might allow plaintiff to perform the essential functions of the nurse aide

6

position, or reassignment in general.

Defendant contends it is entitled to summary judgment because plaintiff's filing for social security disability estops her from claiming she was a qualified individual under the ADA. Alternatively, plaintiff was not "otherwise qualified" to perform the essential functions of the nurse aide position. Plaintiff's medical restrictions prevented her from being able to meet the medium to heavy demands of the job and rendered her unable to satisfy the "essential functions" of lifting and transferring patients. Defendant argues that no reasonable accommodations would have permitted her to perform these essential functions and plaintiff's requested accommodation of using the mechanical lift for every lift and transfer was impractical and unrealistic.

Plaintiff contends that she was "otherwise qualified" to perform the essential functions of the position with reasonable accommodations. The use of the lift was a reasonable accommodation because it was not needed for every lift and transfer. Defendant failed to provide an alternative accommodation when it eliminated her modified duty position, an accommodation that was in place for thirteen years. Finally, plaintiff contends that defendant failed to engage in any interactive process to determine whether any replacement accommodations would enable her to perform the essential functions of the job, or whether transfer and/or job reassignment were available options.

The record and applicable law demonstrate that plaintiff has adduced sufficient evidence to create genuine issues of material fact with respect to whether she is otherwise qualified to perform the essential functions of a nurse aide position with reasonable accommodations. Subsumed within that inquiry are a number of critical questions: (1) whether

lifting constitutes an "essential function" of the nurse aide position, and if so, whether plaintiff

could have performed that function with reasonable accommodations; (2) whether the use of a

mechanical lift would have constituted a reasonable accommodation, and if not, whether any

reasonable accommodation existed that would have enabled her to perform the essential

functions of a nurse aide; (3) whether plaintiff's modified duty position of thirteen years was

itself an accommodation and whether the employer violated the ADA by withdrawing that

accommodation without providing an effective replacement; and (4) whether the employer

failed to engage in the interactive process which could have led to the discovery of a

reasonable accommodation.[4]

---

[4] Defendant's argument that plaintiff is judicially estopped from claiming that she is a qualified individual due to statements made in support of her application for social security disability insurance is unavailing. The "qualified individual" analysis focuses on whether the employee was qualified for the position at the time of the employment decision, which was February 1, 2006, the date plaintiff was terminated. See Gaul v. Lucent Techs. Inc., 134 F.3d 576, 580 (3d Cir. 1998). The fact that plaintiff claimed that she could no longer work as of August 15, 2006 is of no import to her ADA claim that at the time of her termination she was able to perform the essential functions of her job with reasonable accommodations. Plaintiff did not file for social security until May 19, 2008, over two years after her termination, and was found to be retroactively disabled as of her alleged onset date, August 15, 2006, which was more than seven months after her position was eliminated. Ex. AA, Notice of Award (Doc. No. 23-27) at 2. Plaintiff is not claiming that she *currently* is qualified to perform the essential functions of the job. There is nothing inconsistent about her claim that she was qualified *at the time of her termination* but that her condition worsened in the months thereafter. See Feldman v. American Memorial Life Ins. Co., 196 F.3d 783, 790 (7th Cir. 1999) (noting that "the severity of a disability may change over time such that an individual was totally disabled when she applied for SSDI, then later was a qualified individual at the time of the employment decision disputed in an ADA suit. Even though the underlying disability is the same, the SSDI application and the ADA suit might reference quite different points in time between which an improvement or deterioration in the plaintiff's disability may have transpired."). Further, applications for social security disability insurance do not take into account a plaintiff's entitlement to reasonable accommodations, and consequently, judicial estoppel does not bar such a claim as a matter of law. See Turner, 440 F.3d at 608 (finding that the plaintiff's ADA claim was not judicially estopped because long term disability benefits application does not take into account reasonable

The ADA proscribes "discrimination against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A "qualified individual" means a person "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. §12111(8); Buskirk v. Apollo Metals, 307 F.3d 166, 168 (3d Cir. 2002). A "disability" is defined as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual, (B) a record of such impairment; or (C) being regarded as having such an impairment." Id. at § 12102 (2).

In order for a plaintiff to establish a prima facie case of discrimination under the ADA, the plaintiff must show that he or she: (1) is a disabled person within the meaning of the ADA; (2) is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) has suffered an otherwise adverse employment decision as a result of discrimination. See Taylor v. Phoenixville School Dist., 184 F.3d 296, 306 (3d Cir. 1999); Deane v. Pocono Medical Center, 142 F.3d 138, 142 (3d Cir. 1998). The refusal to make reasonable accommodations for a plaintiff's disabilities constitutes an adverse employment decision. Williams v. Phila. Hous. Auth. Police Dep't, 380 F.3d 751, 761 (3d Cir. 2004) ("Adverse employment decisions in this context include refusing to make reasonable

accommodations); Feldman, 196 F.3d at 790 ("[A]n individual might be able to work with reasonable accommodation and therefore be a 'qualified individual' under the ADA, but be unable to work without reasonable accommodation and thus 'totally disabled' under SSDI as well.").

accommodations for a plaintiff's disabilities.") (internal quotation and citations omitted).

The parties do not dispute that plaintiff is "disabled" within the meaning of the ADA and that she suffered an adverse employment action because of that disability. The crux of their contentions relates to the second element of plaintiff's prima facie case: whether she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodations.

The determination of whether an individual with a disability is qualified is made at the time of the employment decision, and not at the time of the lawsuit. Gaul, 134 F.3d at 580. The Interpretive Guidance to the EEOC Regulations preface the inquiry of whether an individual is "qualified" and with two threshold questions: (1) whether the individual has the requisite skill, experience, education and other job-related requirements of the position; and (2) whether the individual, with or without reasonable accommodation, can perform the essential functions of that position. 29 C.F.R. § 1630.2(n); see also Buskirk, 307 F.3d at 168. The determination of whether an individual can, with or without reasonable accommodation, perform the essential functions of the position is a two-step process as well. Deane, 142 F.3d at 146. As the court in Deane explained, "[f]irst, a court must consider whether an individual can perform the essential functions of the job without accommodation. If so, the individual is qualified (and, *a fortiori*, is not entitled to accommodation). If not, then a court must look to whether the individual can perform the essential functions of the job with a reasonable accommodation. If so, the individual is qualified. If not, the individual has failed to set out a necessary element of the prima facie case." Id.

The parties do not dispute plaintiff's general qualifications as a nurse aide or the fact that

10

she would not be qualified to perform the essential functions of a nurse aide without reasonable accommodations. Rather, the central controversy is whether plaintiff would have been qualified to perform the essential functions with reasonable accommodations. Accordingly, the question of whether plaintiff is qualified and therefore afforded the protections of the ADA hinges on whether lifting constitutes an "essential function" of the nurse aide position, and whether any reasonable accommodations would have permitted plaintiff to perform that function.

It is well established that "[w]hether a particular function is essential 'is a factual determination that must be made on a case by case basis [based upon] all relevant evidence.'" Turner v. Hershey Chocolate U.S., 440 F.3d 604, 612 (3d Cir. 2006) (quoting Deane, 142 F.3d at 148); see also Skerski v. Time Warner Cable Co., 257 F.3d 273, 279 (3d Cir. 2001) (same). Whether a job duty is an "essential function" turns on whether it is "fundamental" to the employment position. 29 C.F.R. § 1630.2(n)(1); Turner, 440 F.3d at 612 (quoting 29 C.F.R. §1630.2(n)(1)). The term "essential function" does not include the "marginal" functions of the position. Id. at § 1630.2(n)(1). A job function may be considered essential for any of several reasons, including, but not limited to, the following:

> (i) The function may be essential because the reason the position exists is to perform that function;
>
> (ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or
>
> (iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

Id. at § 1630.2(n)(2). Evidence of whether a particular function is essential can include, but is not limited to:

(i)     The employer's judgment as to which functions are essential;

(ii)    Written job descriptions prepared before advertising or interviewing applicants for the job;

(iii)   The amount of time spent on the job performing the function;

(iv)    The consequences of not requiring the incumbent to perform the function;

(v)     The terms of a collective bargaining agreement;

(vi)    The work experience of past incumbents in the job; and/or

(vii)   The current work experience of incumbents in similar jobs.

Id. at (n)(3).

Plaintiff has put forth sufficient evidence to create a genuine issue of material fact as to whether lifting is an essential function of the nurse aide position.  A reasonable juror could conclude that: (i) the nurse aide position does not exist in order that nurse aides may lift; (ii) allowing or not allowing plaintiff to lift would appear to have no effect on the number of employees required to lift since she held the title of a nurse aide for thirteen years without lifting; and (iii) lifting is not a highly specialized function and plaintiff was not hired for her lifting ability.  See 29 C.F.R § 1630.2(n)(2).

Moreover, consideration of the § 1630.2(n)(3) factors suggests an exercise in restraint from making a premature determination regarding what functions are considered essential. While it is true that defendant deems lifting an essential function of the job, an employer's judgment as to what constitutes an essential function is not dispositive.  See Turner, 440 F.3d at 613, fn. 6 ("We note that the first factor-the employer's judgment as to which functions are essential-is but one piece of evidence to be considered by the trier of fact.").  Similarly, a written

job description is merely one of several factors to consider and is not to be afforded any greater weight because it is specifically listed in 29 C.F.R. § 1630.2(n)(3). See Deane, 142 F.3d at 148 ("We decline to apply conclusive effect to either the job description or [defendant]'s judgment as to whether heavy lifting is essential to [the plaintiff]'s job.").

Interestingly, the written job description at issue, while only a factor, militates against a finding that lifting is an essential function. Defendant vehemently argues that lifting is included in the description under the heading "Essential Functions." Defendant's Brief (Doc. No. 21) at 12 ("[description] also lists as an essential function that the aide be able to lift and transfer residents"). A careful review of the description, however, reveals that the "Essential Functions" section does not make any explicit reference to "lifting." The description states that one of the twenty essential functions of a nurse aide is *"[h]elps to transfer* the residents to and from bed and wheelchair or recliner chair using the mechanical lift, if necessary." Job Description at 3 (emphasis added). The actual wording of the description does not expressly include "lifting" under its "Essential Functions" heading. The only portion of the description that discusses lifting is under the "Physical Demands" section, which is listed separately from the "Essential Functions" section and it states only that a nurse aide must be "physically able to meet medium to heavy demands of standing, walking, bending, lifting, reaching, and pushing." Job Description (Doc. No. 23-8 ) at 3. Listing something as a physical demand of the job is not tantamount to it being considered an essential function, a principle that was brought to bear by the United States Court of Appeals for the Third Circuit in Skerski, where the court highlighted an important distinction between identifying a job requirement and designating that requirement as a function that is essential. 257 F.3d at 280.

13

In <u>Skerski</u>, the plaintiff was hired by Time Warner to service cables, wires, and aerial cable plants. He became unable to climb and work at heights following his panic and anxiety disorder diagnosis. <u>Id.</u> at 273. In reversing the district court's holding that climbing was an essential function, it noted that "climbing" was not expressly included under the "Essential Functions" heading of the job description, and instead was listed under the section titled "Physical Tasks/Requirements." <u>Id</u>. at 280. The fact that the phrase "may climb poles" was included under the "Essential Functions" heading was of little import to the court, which focused on the failure of the description to list "climbing" under the "Essential Functions" section. Although the description "clearly identif[ied] climbing as a job requirement", it held that "describing climbing as a requirement is not necessarily the same as denominating climbing as an essential function." <u>Id.</u> The court further reasoned that the failure to list "climbing" under the "Essential Functions" heading "suggests one could view climbing as a useful skill or method to perform the essential functions of the job but that it is not itself an essential function of the installer technician position." <u>Id.</u>

Similarly, the job description at issue only identifies lifting as one of the physical requirements of the job and does not specifically designate it as an essential function. Just as in <u>Skerski</u>, the failure to include "lifting" under the "Essential Functions" heading of the description suggests that one could view lifting as a useful method to perform the essential functions of the nurse aide position, but that it is not itself an essential function of the job. <u>See</u> <u>id.</u>

Moreover, the description contains no measure of frequency with regard to how often a nurse aide is expected to lift and similarly does not indicate how many pounds a nurse aide is responsible for lifting, aside from the ambiguous description of "medium to heavy demands . . .

14

of lifting." Job Description at 3; Compare <u>Ingerson v. Healthsouth Corp.</u>, 139 F.3d 912 (10th Cir. 1998) (nurse job description states "RN must have the ability to lift objects in excess of 100 lbs with *frequent lifting* and/or carrying objects weighing 50 lbs or more") (emphasis added). There appears to be no requirement that plaintiff must lift on a frequent or continuous basis, or that "lifting" is even with specific regard to residents. Compare <u>Deane</u>, 142 F.3d at 148 ("Frequent lifting of patients" listed under the heading "Major Tasks, Duties and Responsibilities" which was equivalent to "essential functions" section). Importantly, it does not contain any requirement that a nurse aide be able to lift without the assistance of another coworker or lift. The description only states that one of the twenty essential functions of a nurse aide is "[h]elps to transfer the residents to and from bed and wheelchair or recliner chair using the mechanical lift, if necessary." Job Description at 3. A reasonable juror could find that the essential function of transferring residents simply means that if necessary, plaintiff must be prepared and adequately trained to transfer residents using the mechanical lift, a conclusion that would not necessarily implicate lifting.

The legislative history surrounding the ADA also lends support to a finding that lifting is not an essential function of a nurse aide position. As one representative commented, "the essential function requirement focuses on the desired result rather than the means of accomplishing it." 136 Cong. Rec. 11,451 (1990). To illustrate his point, he cited <u>Prewitt v. U.S. Postal Service</u>, 662 F.2d 292 (5th Cir. 1981), where the employer required every employee to perform the job of postal service clerk/carrier using both arms. The plaintiff in <u>Prewitt</u> was unable to meet this requirement because of a disability that caused limited mobility in one of his arms. <u>Id.</u> The court, however, found that the essential function of the job was not the ability to

use both arms, but instead was the ability to lift and carry mail.  Id.

Like the plaintiff in Prewitt, a reasonable juror could conclude that the essential function of the job is not the ability to lift, but instead is the ability to transfer patients to and from their bed, which does not necessarily contemplate lifting in all instances.

Further, it is difficult to suggest that lifting is "fundamental" to the nurse aide position, especially in light of examples (iii) and (iv) listed in §1630.2(n)(3).  See 29 C.F.R. § 1630.2(n)(1).  With the exception of major bathing, plaintiff performed all the other duties and responsibilities of a nurse aide without lifting for an uninterrupted period of thirteen years. Significantly, plaintiff has put forth evidence that other units in the facility demand very little or no lifting because of the types of residents who occupy those units, supporting the proposition that the amount of time spent "lifting" in the nurse aide position is far from substantial and not "fundamental."  See §1630.2(n)(1) and (n)(3)(iii).  Additionally, the fact that plaintiff did not lift for the entire thirteen year period she was on modified duty yet maintained the title of "nurse aide" and never received any unsatisfactory formal performance evaluations demonstrates that her inability to lift did not cause any adverse consequences for defendant, further weakening the argument that lifting is an essential function.[5]  See §1630.2(n)(3)(iv); see also Skerski, 257 F.3d at 283 ("Skerski's ability to perform as an installer technician for more than three years without climbing might lead a reasonable juror to infer that Skerski's inability to climb had no adverse

_____

[5]Plaintiff always received performance evaluations ranging from "Very Good" to "Average" within the four ranking classifications that ranged from "Excellent, Very Good, Average, to Poor."   Plaintiff's Affidavit (Doc. No. 25-1) at 1.  Moreover, her termination notice contained an employee rating sheet that had a box asking whether defendant would re-employ plaintiff.  Ex. R, Employee Termination Form (Doc. No. 23-18) at 2.  The form was completed by the department head and indicated "yes."  Id.

16

consequences for his employer, a factor that is relevant to determining what is an essential function.").

Moreover, plaintiff has demonstrated that a genuine issue of material fact exists with regard to whether all regular duty nurse aides are required to lift or whether it depends on the unit to which they are assigned, a highly relevant factor in an "essential functions" analysis. In her deposition, plaintiff discussed another employee who suffered a back injury that prevented him from lifting residents. Defendant created a regular duty position for him on Annex 1, the special needs unit which is mostly comprised of Alzheimer's residents. Ex. DD, Plaintiff's Deposition (Doc. No. 28-1) at 8-9.[6] The special needs unit does not require the employee to lift because the residents are either ambulatory or require little assistance moving around. In addition to Annex 1, plaintiff has identified another unit, Annex 2, which consists of residents who need minimal assistance in moving around. Id. at 8. Annex 2 is a rehabilitation unit designated for people recovering from surgery in need of short term care. Plaintiff testified that she worked in Annex 2 when she was on modified duty and would be able to work there in a regular duty position because "those people move around themselves." Id. The fact that there is evidence that some units do not require nurse aides to lift directly contradicts defendant's position that aides on all twelve units are required to lift residents at any given time and weighs against a finding that lifting is an essential function. See Deposition of Rose Urban (Doc. No. 23-4) at 7 (discussing how the amount of lifting is the same on all units and stating that "[a]t any

---

[6] The record contains two separate exhibits referencing plaintiff's deposition: Ex. B (Doc. No. 23-2) & Ex. DD(Doc. No. 28-1). Ex. DD reflects the supplemental deposition testimony that was provided to the court upon request. Unless Ex. DD is specifically referenced, all citations to plaintiff's deposition refer to Ex. B.

given time [nurse aides] may be required to lift").

Additionally, the Third Circuit has established a clear directive that questions about what constitutes an essential function of the job is a factual question for the jury to decide. See Deane, 142 F.3d at 148 (refusing to grant summary judgment on the basis that the question of whether lifting heavy objects was an essential function of a nurse was a fact question for the jury); see also Skerski, 257 F.3d at 280 (reversing district court's holding that climbing was an essential function of installer technician and cautioning against snap judgments regarding essential functions); Turner, 440 F.3d at 613 ("[T]he fact issue as to 'essential function' must be decided by a jury."). It has emphasized that "the definition of 'essential function'" set forth in 29 C.F.R. § 1630.2(n)(1), as well as the non-exhaustive list of probative evidence set forth in 29 C.F.R. § 1630.2(n)(3), cautioned against any premature determination of what is an essential function." Turner, 440 F.3d at 613. It has repeatedly declined to substitute its judgment for the jury's regarding what constitutes an essential function and has urged lower courts to follow suit. Id. at 613 ("While our analysis points in the direction of finding that the rotation policy was not an essential function of Turner's job, we have historically refused to make such a factual finding on our own, lest we run afoul of our own directive to the district courts that these issues are for the jury to decide.").

A grant of summary judgment would necessitate the conclusion that "reasonable jurors could not but find that [lifting] is an essential function of the [nurse aide] position at [Friendship Ridge]." Turner, 440 F.3d at 612. A thorough review of the record precludes the acceptance of that proposition. Several fact issues exist relating to the second element of plaintiff's prima facie case and the evidence viewed in the light most favorable to her could lead a reasonable juror to

18

conclude that lifting is not an essential function of the nurse aide position, and that therefore plaintiff is a "qualified individual" for purposes of the ADA.

Moreover, even if lifting is deemed to be an essential function, genuine issues of material fact still exist as to whether plaintiff would have been able to perform that function with reasonable accommodations, precluding the grant of summary judgment.

Under the Act, adverse employment decisions include refusing to make reasonable accommodations for a plaintiff's disabilities. See Williams, 380 F.3d at 761 (internal quotation and citations omitted). An employer must make "reasonable accommodations to the known physical or mental limitations of the individual unless the [employer] can demonstrate that the accommodations would impose an undue hardship on the operation of the business of the [employer]." 42 U.S.C. § 12112(b)(5)(A).

A "reasonable accommodation" includes:

> Job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9)(B).

The EEOC regulations define reasonable accommodations as "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position." 29 C.F.R. §1630.2(o)(1)(ii). "[T]he question of whether a proposed accommodation is reasonable is a question of fact." Buskirk, 307 F.3d at 170; see also Skerski, 257 F.3d at 286;

19

Turner, 440 F.3d at 614 ("As with the issue of "essential function," the issue of "reasonable accommodation" presents a fact question.").

In asserting an ADA failure-to-accommodate claim, the employee must make a facial showing that her proposed accommodation was possible; if so, the burden shifts to the employer to prove its affirmative defense that the requested accommodation was unreasonable or would cause undue hardship on the employer. Turner, 440 F.3d at 614 (citing Gaul, 134 F.3d at 580). The plaintiff's burden only requires the identification of an accommodation where the costs do not clearly exceed its benefits on its face. See Walton v. Mental Health Ass'n of Southeastern Pa., 168 F.3d 661, 670 (3d Cir. 1999). A grant of summary judgment for a defendant is appropriate only "in cases in which plaintiff's proposal is either *clearly ineffective* or *outlandlishly* costly." Id. at 670 (quotation omitted) (emphasis added).

Plaintiff has satisfied her initial burden of making a facial showing that her proposed accommodation is possible. She presented her employer with a medical release containing three proposed accommodations and contends that her requested accommodation of using the mechanical lift to transfer residents who could not bear their own weight would have allowed her to perform the essential functions of the job. The record contains evidence that at least one lift is located on each of the twelve floors, with several floors containing two to three lifts. See Deposition of Rose Urban at 6. Defendant did not need to expend money in order to acquire these lifts since there was an abundance of them already in its possession and readily available for use, thereby supporting plaintiff's claim that the accommodation was possible.

Moreover, plaintiff testified that it was the unwritten policy and practice that the use of the lift was determined by a collective of nurse aides and/or a supervisor, contradicting

20

defendant's argument that the use of the lift is authorized only pursuant to a doctor's order. See Affidavit of Plaintiff (Doc. No. 25-1) at 2.[7] Plaintiff also pointed to the job description which does not contain any requirement that plaintiff be able to lift without the assistance of the mechanical lift. The description also specifically authorizes the use of the lift if it was necessary in assisting with the transfer of residents. It states, "[h]elps to transfer the residents to and from bed and wheelchair or recliner chair using the mechanical lift, if necessary." Job Description at 3. Admittedly, there is tremendous dispute over the meaning of "if necessary", with plaintiff arguing that it means if the lift was necessary for the nurse aide or the resident, and defendant arguing that it meant for the resident only. See Plaintiff's Deposition at 16. The evidence viewed in the light most favorable to plaintiff, however, suggests the lift could be used if it was necessary for the nurse aide or the resident. Plaintiff testified that during her orientation at Friendship Ridge, they were taught how to operate the lift and told "that's for your use and for [the residents], to make sure that everybody's safe." Ex. DD, Plaintiff's Deposition at 5. Additionally, the nursing procedure manual for the hydraulic lift specifically states that the purpose of the lift is to: 1) transfer the resident from their bed to chair and chair to bed in comfort and safety; and 2) *protect the resident and employee from injury*. Ex. S, Nurse Aide's Orientation Handouts (Doc. No. 23-19) at 8 (emphasis added). The fact that one of the purposes of the lift specifically accounts for employee safety credits plaintiff's argument and a reasonable juror could conclude that the lift could be used if it was necessary to maintain the safety of the

---

[7]Although this piece of testimony appears in the affidavit which defendant seeks to strike from the record as a sham, it does not contradict plaintiff's earlier deposition testimony and is not inconsistent with the record. Consequently, it is not improper to include it as a factor in the analysis.

nurse aide. Another relevant factor that weighs in plaintiff's favor is that the use of a lift requires

the same number of coworkers as the lift and transfer of residents using the "arm and leg"

method.[8] See Ex. B, Plaintiff's Deposition at 17; see also Ex. DD, Plaintiff's Deposition at 7. In

either scenario, at least two nurse aides are required to lift and transfer the resident. All these

facts combine to support plaintiff's argument that her proposed accommodation was not

"outlandishly costly or clearly ineffective."

Although the terms of her medical release stated that plaintiff must use the lift for every

lift and transfer, the evidence viewed in the light most favorable to her indicates that she would

only need the lift for residents who were not ambulatory or could not assist in holding their own

weight. Ex. DD, Plaintiff's Deposition at 4. Plaintiff testified that if the resident was ambulatory

or would only require minimal assistance, then she would not need the lift to transfer that

resident because they can help hold their own weight and transfer themselves. Id. If the resident

does not require substantial assistance at the transfer stage, then the plaintiff would not need the

help of the lift to transfer. The only time she would need the use of the lift is if an arm and leg

type transfer was required. Id. at 6. The fact that plaintiff sought the use of the lift only as a

substitute for the arm and leg method qualifies the medical release tremendously and

demonstrates that she would not have needed the lift for every resident transfer, supporting her

position that the proposed accommodation is facially possible. See Ex. B, Plaintiff's Deposition

at 15. The fact that while on modified duty plaintiff was assisting with transfers of residents who

---

[8] The arm and leg method refers to the transfer process where two nurse aides physically lift and
move a resident from bed to chair. One aide gets on each side of the resident, and each aide
positions his or her self so that both are supporting the resident by getting under his or her arms
and legs.

were ambulatory or could bear weight also lends credence to this argument.  Id. at 21.

Defendant contends that the use of the mechanical lift is impractical and unrealistic, yet misses the mark in offering evidence sufficient to satisfy its burden of proving undue hardship or unreasonableness.   It argues that plaintiff has not offered evidence that her proposed accommodation would not have caused an undue hardship.  Def. Reply Brief (Doc. No. 27) at 2. Of course, it is not plaintiff's responsibility to prove defendant's affirmative defense and defendant has the burden of proving that the proposed accommodation would cause an undue hardship or would be unreasonable.  See Turner, 440 F.3d at 614 (explaining that once plaintiff has made a prima facie showing that the proposed accommodation is possible, then the burden shifts to the employer to prove as an affirmative defense that the requested accommodations are unreasonable or would cause an undue hardship on the employer)(citing Gaul, 134 F.3d at 580).

Defendant relies on three main arguments to support its position that use of the lift is "impractical and unrealistic."  First, the use of the lift is not discretionary and is determined only pursuant to a doctor's order.  Second, permitting plaintiff to use the lift when necessary would offend resident independence and integrity.  Finally, the lift is not a reasonable accommodation because plaintiff would require the lift for every lift and transfer.  All of these fail to find sufficient support in the record.

The only evidence offered in support of its first contention takes the form of conclusory assertions and the deposition of Rose Urban, defendant's Director of Nursing, who testified that the use of the lift is determined by a physician's order and that a nurse aide does not have the discretion to make that decision.  Deposition of Rose Urban at 4.  She also testified, however, that she has been off the floor for twenty-five years and therefore has not had occasion to witness

23

a resident transfer with the use of the lift but without a physician's order.  <u>Id.</u> at 8.  Further,

plaintiff has sworn that it was the informal policy to use the lift without physician orders and at

summary judgment her position must be accepted as true.  <u>See</u> Affidavit of Plaintiff at 2.  It is

compelling that the record does not contain any other evidence that supports Ms. Urban's

testimony.  There are no documents to suggest that physician authorization is the only means of

using the lift, and the lift procedure manual itself does not make any reference to the

circumstances under which a lift may be used.  While it may have been the formal policy to

authorize use of the lift only pursuant to a physician's orders, a reasonable juror could very well

find that it was the unwritten practice to allow nurse aides to use the lift at their discretion.

Defendant's contention regarding resident integrity equally is unavailing. The record

does not contain evidence that the use of the lift would offend resident integrity or independence

aside from Ms. Urban's testimony that in terms of resident dignity, the use of the lift "could be

something that a resident is not real comfortable with."  Deposition of Rose Urban at 6.  When

asked whether she has ever personally witnessed a situation where the resident is too

embarrassed to use the lift, her response was only that "it's happened."  <u>Id.</u>  Plaintiff's testimony,

however, indicates that she's never "had a resident indicate that it took any of their independence

away using a mechanical lift on them" and that the use of the lift was actually more dignified

than the arm and leg type of transfer which could be more offensive to some residents because in

the process of that type of  transfer their "legs are spread apart" and their "dress is riding up."

Plaintiff's Deposition at 15.  In the light most favorable to plaintiff, her testimony must be

accepted as true and a reasonable juror could find that the use of the lift would not offend the

integrity or independence of residents.

24

Likewise, defendant's argument that plaintiff would require the use of the lift for every transfer is unsupported by the record. This argument loses its force in light of plaintiff's testimony that she would not require the use of the lift for every single transfer, despite her medical release stating as much. Plaintiff testified that the release by Dr. Cozza "would be for a resident who could not bear weight, who could not stand to pivot." Plaintiff's Deposition at 15. Although the terms of the release do not state that important qualifier, plaintiff argues that it was not how the release was intended and she was seeking only to substitute the use of the lift for transfers requiring the arm and leg method. Plaintiff's position that she would only need the assistance of the lift for residents who were non-ambulatory or could not bear their own weight is made all the more compelling by the fact that while on modified duty she was helping transfer residents who were ambulatory or who could bear weight. Id. at 21.

The only scintilla of evidence that discusses a situation in which the lift is not to be used is in the form of a hip replacement procedure document contained in the nurse aide orientation handouts. See Nurse Aide's Orientation Handouts at 13. This document discusses the overall procedure when dealing with residents who have recently undergone hip replacement and with respect to the transfer of those residents, it states "Do not Hoyer". Id. However, there is evidence that three different types of lifts are present at the facility: the Hoyer, Medi-Man, and Sit-to-Stand. Id. at 7. These lifts all have different seats and place the residents in different positions. A reasonable juror could conclude that the hip replacement procedure document was referring only to a specific type of lift, the Hoyer, and not the use of all lifts in general. Consequently, he or she could also conclude that plaintiff's requested accommodation is possible, precluding the grant of summary judgment.

Moreover, the EEOC issued a determination finding that defendant committed a violation of the ADA in failing to accommodate plaintiff. EEOC Letter of Determination (Doc. No. 25-2) at 1. The import of an EEOC letter of determination has been held to be significant enough on its own to defeat summary judgment. See Gifford v. Atchison, Topeka and Santa Fe Ry. Co., 685 F.2d 1149, 1156 (9th Cir. 1982) (EEOC's reasonable cause determination was sufficient to create a genuine issue of material fact in sex discrimination case making grant of summary judgment inappropriate). Also, it has been held to be a "highly probative evaluation of an individual's discrimination complaint" due to the fact that it is prepared by "professional investigators on behalf of an impartial agency." Plummer v. Western Intern. Hotels Co., 656 F.2d 502, 505 (9th Cir. 1981). The letter of determination indicated that "the investigation has established the existence of a violation of the ADA." Id. at 2. The EEOC determined that plaintiff "articulated a reasonable accommodation in stating that she needs a mechanical lifting device" and that defendant "failed to engage in the interactive process of even discussing an effective accommodation." Id. It also determined that allowing plaintiff to remain in this modified position for thirteen years was itself an accommodation, and by withdrawing this accommodation via the restructuring of the modified work program without providing an effective replacement violated the ADA. Id.

Defendant's argument that the modified duty program was intended to be temporary from its inception but for its "blatant disregard for its temporary nature" over the years is unavailing. It is true that the ADA does not require that an employer accommodate the employee by transforming a temporary light duty position into a permanent one. Buskirk, 307 F.3d at 169; see also Mengine v. Runyon, 114 F.3d 415, 418 (3d Cir.1997). However, the present factual

scenario is both unique and troubling in the sense that plaintiff was operating under the belief that the modified duty position was her permanent position for thirteen years while defendant perpetuated this belief without giving any clear indication to the contrary. Plaintiff testified that she was never advised about any restrictions regarding the period of time she could remain in the modified duty position until the last quarter of 2005, "right before they put [her] out the door." Plaintiff's Deposition at 11. Plaintiff spent thirteen out of her eighteen years as a nurse aide working in the modified duty position, which strongly suggests that it was by no means intended to be temporary. Against this backdrop, defendant's assertion that plaintiff had knowledge of the temporary nature of her position because of a letter she received in 1997 informing her of the possibility that the program might be eliminated but that no final decision had been reached, does not make defendant's position any more convincing. See Ex. O, June 20, 1997 Letter to Plaintiff (Doc. No. 23-15) at 2. Notice that an entire program was being considered for elimination is not tantamount to a policy that expressly limits all modified duty positions to a finite period of time.

All the above facts support a finding that genuine issues of material fact exist as to whether plaintiff's proposed accommodation of using the mechanical lift to assist her in the lift and transfer of residents who were not ambulatory or could not bear their own weight was possible. Defendant's failure to prove undue hardship or unreasonableness as a matter of law precludes the grant of summary judgment.

Plaintiff also has put forth sufficient evidence to create a genuine issue of material fact as to whether defendant failed to engage in the interactive process after she requested an accommodation, thus raising the question of whether plaintiff could have been accommodated but for defendant's lack of good faith.

27

Based on the EEOC regulations and interpretive guidelines, the Third Circuit has held that "both parties have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith." Taylor, 184 F.3d 296, 312 (quoting Mengine, 114 F.3d at 419-20).[9] Notably, other circuits have taken this view as well. See, e.g., Beck v. University of Wisconsin Bd. of Regents, 75 F.3d 1130, 1135 (7th Cir. 1996) ("A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith."); Taylor v. Principal Financial Group, Inc., 93 F.3d 155, 165 (5th Cir. 1996) (The "employee's initial request for an accommodation ... triggers the employer's obligation to participate in the interactive process ..."). The term "'[r]easonable accommodation' further 'includes the employer's reasonable efforts to assist the employee and to communicate with the employee in good faith . . . ." Taylor, 184 F.3d at 312. (quoting Mengine, 114 F.3d at 416.)

"An employee can demonstrate that an employer breached its duty to provide reasonable accommodations because it failed to engage in good faith in the interactive process by showing that: '1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith.'" Williams, 380 F.3d at 772 (quoting Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 317 (3d Cir. 1999)).

---

[9]Although Mengine involved a claim under the Rehabilitation Act, the regulation and interpretive guidelines applied in the case were from the ADA. Additionally, the ADA does not apply a lesser standard than the Rehabilitation Act. See 42 U.S.C. § 12201(a); see also Bragdon v. Abbott, 524 U.S. 624 (1998).

Further, where an employee has notified his or her employer of a desire for an accommodation, the employer "cannot escape its duty to engage in the interactive process simply because the employee did not come forward with a reasonable accommodation that would prevail in the litigation." Taylor, 184 F.3d at 317. As one court noted, "[t]he interactive process would have little meaning if it was interpreted to allow employers, in the face of a request for accommodation, simply to sit back passively, offer nothing, and then, in post–termination litigation, try to knock down every specific accommodation as too burdensome." Id. at 315.

The highlighted scenario is one that essentially is presented by the facts in this case. Defendant, in the face of a request for accommodation by plaintiff, simply sat back passively, offered nothing, and then in post-termination litigation, argues that the accommodation is too burdensome. This is precisely the type of situation the ADA sought to eradicate by requiring both parties to engage in the interactive process. Likewise, it is also why some of the burden is placed on the employer to "make a reasonable effort to determine the appropriate accommodation." 29 C.F.R. § 1630.9 at 359.

There is ample evidence that could lead a reasonable juror to conclude that defendant failed to engage in the interactive process. First, the fact that plaintiff suffered multiple work related injuries and had been on the modified program since 1993 demonstrates that defendant has been aware of plaintiff's disability from the outset. Second, plaintiff requested the accommodation of the mechanical lifting device when she presented her medical release to defendant. Third, defendant did not discuss the proposed accommodations with plaintiff, nor did it offer any alternative accommodations or assistance in identifying one. It took no initiative to discuss whether any accommodations could be put in place that would have allowed plaintiff to

remain employed. See Taylor, 184 F.3d at 315 ("The interactive process, as the name implies, requires the employer to take some initiative."). Instead, defendant essentially told her that she either had to come back to "regular duty" work disability-free or collect worker's compensation benefits. These facts could support a jury finding that defendant did not make a good faith effort to assist plaintiff in seeking accommodations.

Finally, plaintiff has articulated facts sufficient to allow a reasonable juror to conclude that she could have been accommodated, but for defendant's lack of good faith. She has made a facial showing that her proposed accommodation was possible and there is evidence from which a reasonable juror could conclude that defendant essentially ignored plaintiff's request and refused to make accommodations for her on the basis that it did not believe she was disabled within the meaning of the ADA.[10]

Defendant's mistaken belief that plaintiff was not covered by the ADA and subsequent refusal to discuss the feasibility of her requested accommodation support a jury finding that it failed to engage in the interactive process. Of concern is the fact that the record contains evidence of another instance that occurred a few years prior to plaintiff's termination. Before the revision of the modified work program, plaintiff approached defendant and expressed her desire to return to regular duty work. Ex. DD, Plaintiff's Deposition at 3. She explained that she would need the accommodation of a lift because her knee was too unstable without it. Defendant "did not even want to discuss it" and told her that "[she] had to be 100% before [she] could be released for regular duty." Id. This could be viewed as yet another episode where plaintiff has

---

[10] Plaintiff testified that defendant informed her that "they couldn't take [her] back and make accommodations for [her], because [she] was not covered by the American Disability Act." Ex. B, Plaintiff's Deposition at 19.

requested an accommodation to return back to regular duty, and instead of discussing the potential accommodation, defendant essentially retorted with the ultimatum that she either come back to work disability-free or remain in the modified duty position. In other words, it failed to offer any assistance in identifying a reasonable accommodation on this occasion as well.

Genuine issues of material fact exist with regard to whether defendant failed to engage in the interactive process, thereby precluding a grant of summary judgment. Accordingly, defendant's motion for summary judgment will be denied.

Date: February 14, 2011

s/ David Stewart Cercone
David Stewart Cercone
United States District Judge

cc:     Marie Milie Jones, Esquire

        Erik M. Yurkovich, Esquire

        Via: CM/ECF Electronic Filing